UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| EYEXAM OF CALIFORNIA, INC., a California corporation; and LUXOTTICA RETAIN NORTH AMERICA INC., an Ohio corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ALLIED WORLD SURPLUS LINES INSURANCE COMPANY, et al.,<br><br>Defendants. | Case No. 3:15-cv-03643-LB<br><br>**ORDER DENYING ALLIED'S MOTION TO DISMISS**<br><br>[Re: ECF No. 17] |

**INTRODUCTION**

The plaintiffs EYEXAM of California, Inc. and Luxottica Retail North America, Inc. ("LRNA") sued the defendants Allied World Surplus Lines Insurance Co. and Darwin Select Insurance Co. for Darwin's failure to defend them in two underlying lawsuits. Allied, as Darwin's successor, moves to dismiss the claims arising from one lawsuit (*Altair Eyewear, Inc. v. Luxottica Retail North America, Inc., et al.*), on the ground that the lawsuit was not covered under the insurance policy's definition of "Claim." The court denies Allied's motion.

**STATEMENT**

**1. The Parties**

EYEXAM is a health care service plan under the Knox-Keene Health Care Service Plan Act of

ORDER (No. 3:15-cv-03643-LB)

1975, Cal. Health & Safety Code § 1340 et seq., and is licensed by the California Department of Managed Healthcare. (Complaint, ECF No. 1, ¶ 10.) EYEXAM employs practicing optometrists who are licensed by the California Board of Optometry. (*Id.*) LRNA is a dispensing optician registered with the Division of Licensing of the California Medical Board. (*Id.* ¶ 11.) LRNA owns and operates LensCrafters, which has over 100 retail locations in California. (*Id.*) LRNA and EYEXAM have adopted business practices at LensCrafters retail locations to provide consumers with a "one-stop shopping" experience in which they can (i) obtain their eyeglass prescription from a licensed optometrist employed by EYEXAM, (ii) purchase frames and eyewear accessories, and (iii) have their lenses and frames fitted by a trained optician. (*Id.* ¶ 12.)

Darwin issued the insurance policy at issue in this litigation to EYEXAM and LRNA. (*Id.* ¶ 13.) Allied is the successor to Darwin. (*Id.* ¶ 6.)

**2. The Insurance Policy**

Darwin issued a Managed Care Organization Errors and Omissions Liability Insurance Policy No. 0303-7769, effective March 15, 2013 to March 15, 2014 (the "Policy"), to Luxottica U.S. Holdings Corp. (*Id.* ¶ 13; Policy, ECF No. 18-1, Policy Declarations.[1]) EYEXAM was named as an "Insured Entity," and LRNA was named as an "Additional Insured," pursuant to an endorsement. (Complaint, ECF No. 1, ¶ 13; Policy, ECF No. 18-1, Endorsement No. 17.)

The Policy covers "any **Insured Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period** . . . ." (Complaint, ECF No. 1, ¶ 14; Policy, ECF No. 18-1, Insuring Agreement, § I, Definitions, § IV(J) (bolding in original).) The policy has the following relevant definitions:

- "'**Loss**' means **Defense Expenses** and any monetary amount which an insured is legally obligated to pay as a result of a **Claim**." (Policy, ECF No. 18-1, Definitions, § IV(J); *see* Complaint, ECF No. 1, ¶ 14.) "**Defense Expenses**" are defined in part as "reasonable legal

---

[1] The court grants Allied's unopposed request that the court consider the entire Policy under the incorporation-by-reference doctrine. (*See* Motion, ECF No. 17 at 3 n.1, 6; Request for Judicial Notice, ECF No. 18; Opposition, ECF No. 19 at 9 n.4); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

ORDER (No. 3:15-cv-03643-LB)   2

fees and expenses incurred in the investigation, adjustment, defense, or appeal of a Claim." (Complaint ¶ 14; Policy, Definitions, § IV(E).)

- "'**Claim**' means any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act** . . . ." (Policy, ECF No. 18-1, Definitions, § IV(C); *see* Complaint, ECF No. 1, ¶ 15.)

- "'**Wrongful Act**' means: [] (1) any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting within the scope of his or her duties or capacity as such . . . ." (Policy, ECF No. 18-1, Definitions, § IV(W)(1); *see* Complaint, ¶ 16.)

- "'**Managed Care Activity**' means any of the following services or activities: **Provider Selection**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage of payment of **Medical Services**; and services or activities performed in the administration or management of health care of workers' compensation plans." (Complaint, ECF No. 1, ¶ 16; Policy, ECF No. 18-1, Definitions, § IV(K).) An endorsement amends the term "Managed Care Activity" to include "[c]onsumer directed health plans, prescription drug, behavioral health, dental, vision, long or short-term disability and automobile medical payment plans." (Complaint, ECF No. 1, ¶ 17; Policy, ECF No. 18-1, Endorsement No. 6.)

- "'**Provider Selection**' [one of the **Managed Care Activities**] means any of the following, but only if performed by an **Insured**: evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services**." (Policy, ECF No. 18-1, Definitions, § IV(P); *see* Complaint, ECF No. 1, ¶ 18.)

- "'**Medical Services**' means health care, medical care, or treatment provided to any individual. . . ." (Policy, ECF No. 18-1, Definitions, § IV(M); *see* Complaint, ¶ 18.)

ORDER (No. 3:15-cv-03643-LB)

3

**3. The *Altair* Action**

EYEXAM and LRNA were named as defendants in two lawsuits: (1) *Altair Eyewear, Inc. v. Luxottica Retail North America, Inc., et al.*, Superior Court of California, County of Sacramento, Case No. 34-2014-00156471; and (2) *Smith v. Luxottica Retail North America, et al.*, United States District Court, Southern District of California, Case No. 14-cv-0366 JAH (BLM). (Complaint, ECF No. 1, ¶ 2.) Allied moves to dismiss the claims challenging its alleged failure to defend in the *Altair* lawsuit. Altair filed is complaint on January 10, 2014 against LRNA and EYEXAM in Sacramento County Superior Court. (*Id.* ¶ 20; *see also Altair* Complaint, ECF No. 1-1.) Relevant allegations from that complaint are as follows.

At all relevant times, Altair was in the commercial business of selling eyeglass frames as retail fashion accessories and was a competitor of LRNA. (Complaint, ECF No. 1, ¶ 21; *Altair* Complaint, ECF No. 1-1, ¶ 2.) Altair alleged that it lost business because LRNA and EYEXAM unlawfully provided consumers with a "one-stop shopping" experience. (Complaint, ECF No. 1, ¶ 21; *Altair* Complaint, ECF No. 1-1, ¶¶ 18-19, 42-45.) To create this experience:

- LRNA provided office space at its LensCrafters stores for EYEXAM's doctors. (*Altair* Complaint, ECF No. 1-1, ¶¶ 18-19, 22, 25-26.)
- LRNA and its LensCrafters employees actively advertised, scheduled, and furnished the services of EYEXAM optometrists through LRNA's LensCrafters website, other advertising, and signage in its retail stores. (*Id.* ¶¶ 18-20.)
- LRNA selected, approved, and paid for the optometric equipment and supplies for the EYEXAM doctors practicing at LRNA's LensCrafters stores, and LRNA and EYEXAM jointly controlled the ownership and retention of patient optometric records. (*Id.* ¶¶ 18, 21.)
- LRNA designed its LensCrafters stores to require patients to walk through the dispensary where LRNA frames are sold, to the back of the store for an eye exam, and if issued a prescription, to walk back out through the dispensary, allowing LRNA's LensCrafters employees to pressure or direct the vast majority of patients to fill their prescriptions and purchase LRNA lenses and frames. (*Id.* ¶¶ 18-19, 25-26.)
- EYEXAM paid most of its doctors by the hour, which gave LRNA and EYEXAM the

ORDER (No. 3:15-cv-03643-LB)

4

power to reduce or increase scheduled hours and compensation and to better control the doctors' professional judgment with punishments or rewards. (Id. ¶ 27.)

- LRNA and EYEXAM actively pursued and retained doctors who understood that promoting LRNA's products to patients is an important part of their jobs. (Id. ¶ 28.)
- LRNA and EYEXAM used "capture rates"—the frequency with which LRNA's LensCrafters dispensary "captures" the business generated by EYEXAM's doctors' exams and prescriptions—to evaluate and decide whether to promote EYEXAM's doctors. (*Id.* ¶¶ 18-19, 28-31.)

Altair alleged that LRNA's and EYEXAM's business practices do not comply with several California statutes regulating licensed optometrists and dispensing opticians. (Complaint, ECF No. 1, ¶¶ 21-22; *Altair* Complaint, ECF No. 1-1, ¶¶ 7-17, 34-40.) Altair thus sued LRNA and EYEXAM for unfair competition in violation of California Business and Professions Code § 17200 et seq. (Complaint, ECF No. 1, ¶ 21; *Altair* Complaint, ECF No. 1-1, ¶¶ 33-45.) Altair sought injunctive relief, private attorney general attorneys' fees, and costs. (Complaint, ECF No. 1, ¶ 21; *Altair* Complaint, ECF No. 1-1 at 13-14.)

LRNA and EYEXAM provided timely notice and asked Darwin to pay for defense costs incurred in defending the *Altair* Action. (Complaint, ECF No. 1, ¶ 23.) Darwin denied coverage and refused to pay such expenses. (*Id.*) LRNA and EYEXAM subsequently explained to Darwin why its coverage position was incorrect and provided further information demonstrating that the *Altair* Action was covered under the Policy. (*Id.*) More than once, LRNA and EYEXAM asked Darwin to reconsider its position, but Darwin responded by confirming its denial of coverage. (*Id.*)

The Superior Court dismissed the *Altair* Action on December 5, 2014. (Complaint, ECF No. 1, ¶ 20.)

**4. Relevant Procedural History**

On August 10, 2015, the plaintiffs LRNA and EYEXAM filed this lawsuit against the defendants Darwin and Allied for wrongfully denying coverage and refusing to pay the defense expenses incurred for the *Altair* Action and the *Smith* Action. (*See generally* Complaint, ECF No. 1.) Allied moved to dismiss the claims relating to the *Altair* Action on the ground that the *Altair*

ORDER (No. 3:15-cv-03643-LB)

5

1 Action was not a "Claim" covered under the Policy. (*See* Motion, ECF No. 17.) The claims
2 relating to the *Altair* Action are claims one, two, and five: 1) claim one is for declaratory relief to
3 establish the duty to pay; 2) claim two is for breach of contract for failing to pay defense expenses;
4 and 3) claim five is for breach of the covenant of good faith and fair dealing. (*Id.* ¶¶ 36-56.)

The court held a hearing on the motion on November 12, 2015. (Minute Order, ECF No. 37.)

## GOVERNING LAW

### 1. Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)." A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level…." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, "'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

If a court dismisses a complaint, it should give leave to amend unless the "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

### 2. The Interpretation of Insurance Agreements

In *MacKinnon v. Truck Insurance Exchange*, the California Supreme Court summarized the

ORDER (No. 3:15-cv-03643-LB)

principles for interpreting insurance policies:

> Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal. 4th 1, 18, 44 Cal. Rptr. 2d 370, 900 P.2d 619 (*Waller*).) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)' [Citations.] A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Id.* at p. 18, 44 Cal. Rptr. 2d 370, 900 P.2d 619.)
>
> Moreover, insurance coverage is "'"interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer."'" (*White v. Western Title Ins. Co.* (1985) 40 Cal. 3d 870, 881, 221 Cal. Rptr. 509, 710 P.2d 309.) . . . The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal. 4th 1183, 1188, 77 Cal. Rptr. 2d 537, 959 P.2d 1213.)

31 Cal. 4th 635, 647-48 (Cal. 2003).

### 3. An Insurer's Duty to Defend

In *Scottsdale Insurance Company v. MV Transportation*, the California Supreme Court summarized the principles relating to an insurer's duty to defend as follows:

> An insurer must defend its insured against claims that create a potential for indemnity under the policy. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal. 4th 287, 295, 24 Cal. Rptr. 2d 467, 861 P.2d 1153 (*Montrose*); *Gray v. Zurich Insurance Co.* (1966) 65 Cal. 2d 263, 275, 54 Cal. Rptr. 104, 419 P.2d 168 (*Gray*).) The duty to defend is broader than the duty to indemnify, and it may apply even in an action where no damages are ultimately awarded. (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal. 4th 1076, 1081, 17 Cal. Rptr. 2d 210, 846 P.2d 792.)
>
> Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. (*Montrose*, *supra*, 6 Cal. 4th 287, 295, 24 Cal. Rptr. 2d 467, 861 P.2d 1153.) But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered. (*Ibid.*) Moreover, that the precise causes of action pled by the third-party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability. (*Gray*, *supra*, 65 Cal. 2d 263, 275-276, 54 Cal. Rptr. 104, 419 P.2d 168; *CNA Casualty of California v. Seaboard Surety Co.* (1986) 176 Cal. App. 3d 598, 610-611, 222 Cal. Rptr. 276.)

ORDER (No. 3:15-cv-03643-LB)

> The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage. (*Montrose*, *supra*, 6 Cal. 4th 287, 295, 24 Cal. Rptr. 2d 467, 861 P.2d 1153.) When the duty, having arisen, is extinguished by a showing that no claim can in fact be covered, "it is extinguished only prospectively and not retroactively." (*Buss v. Superior Court* (1997) 16 Cal. 4th 35, 46, 65 Cal. Rptr. 2d 366, 939 P.2d 766 (*Buss*); s*ee also Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal. 4th 38, 58, 70 Cal. Rptr. 2d 118, 948 P.2d 909 (*Aerojet-General*).)
>
> On the other hand, "in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. [Citation.] 'This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for [such] a defense. . . . [T]he duty to defend is contractual. "The insurer has not contracted to pay defense costs" for claims that are not even potentially covered.' [Citation.]" (*Aerojet-General*, *supra*, 17 Cal. 4th 38, 59, 70 Cal. Rptr. 2d 118, 948 P.2d 909, quoting *Buss*, *supra*, 16 Cal. 4th 35, 47, 65 Cal. Rptr. 2d 366, 939 P.2d 766.)
>
> From these premises, the following may be stated: If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.

36 Cal. 4th 643, 654-55 (Cal. 2005).

## ANALYSIS

The issue is whether the Altair lawsuit is a "Claim" under the Policy. Allied makes several arguments that it is not. (Motion, ECF No. 17 at 6-8; Reply, ECF No. 23 at 4-9.)

First, Allied argues that the *Altair* Action does not meet the Policy's definition of a "Claim" because "Claims" can be brought only by healthcare providers or plan members, and Altair "is neither a member (i.e., an enrollee or subscriber) nor a provider (i.e., a professional or health facility licensed to deliver or furnish healthcare service) of EYEXAM's health care plan, but rather is alleged to be a competitor of [the p]laintiffs which has suffered economic harm as a result of [the p]laintiffs' business practices in the form of loss of market share and sales." (Motion, ECF No. 17 at 7-8.) But as the plaintiffs point out, nothing in the Policy says that "Claims" may be filed only by healthcare providers or plan members. Under the Policy, a "Claim" is "any written notice received by any Insured that <u>a person or entity</u> intends to hold an Insured responsible for a Wrongful Act . . . ." (Policy, ECF No. 18-1, Definitions, § IV(C) (emphasis added).) By its own

ORDER (No. 3:15-cv-03643-LB)    8

terms, a "Claim" is not limited to claims brought by healthcare providers or plan members.

Second, Allied argues that the *Altair* Action is not a "Claim" because Altair did not try to hold the plaintiffs responsible for a "Wrongful Act." (Motion, ECF No. 17 at 7.) The plaintiffs' acts were not "Wrongful Acts," Allied argues, because the "acts, errors, and omissions" that Altair alleged in the *Altair* Action do not fall within the Policy's definition of "Managed Care Activity." (*Id.*)

Here, the Policy defines "Managed Care Activity," and the definition encompasses a wide range of conduct. It includes:

> any of the following services or activities: **Provider Selection**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage of payment of **Medical Services**; and services or activities performed in the administration or management of health care of workers' compensation plans.

(Policy, ECF No. 18-1, Definitions, § IV(K).) It also includes "[c]onsumer directed health plans, prescription drug, behavioral health, dental, vision, long or short-term disability and automobile medical payment plans." (Policy, ECF No. 18-1, Endorsement No. 6.)

Allegations in the *Altair* Action fall within this definition. For example, Altair alleged that LRNA and EYEXAM actively pursued and retained doctors who understood that promoting LRNA's products to patients is an important part of their jobs, used "capture rates" to evaluate and decide whether to promote EYEXAM's doctors, and paid most of the doctors by the hour, which gave them the power to reduce or increase scheduled hours and compensation and to better control the doctors' professional judgment with punishments or rewards. (*Altair* Complaint, ECF No. 1-1, ¶¶ 18-19, 27-31.) These acts fall within the Policy's definition of "Provider Selection," which means "evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services**." (Policy, ECF No. 18-1, Definitions, § IV(P).) Altair also alleged that LRNA provided office space at its LensCrafters stores for EYEXAM's doctors and that LRNA and its LensCrafters employees actively advertised, scheduled, and furnished the services of EYEXAM optometrists through LRNA's LensCrafters website, other advertising, and signage

ORDER (No. 3:15-cv-03643-LB)

9

in its retail stores. (*Altair* Complaint, ECF No. 1-1, ¶¶ 18-20, 22, 25-26.) These acts constitute "Managed Care Activity" because they constitute the "advertising, marketing, selling, or enrollment for health care or workers' compensation plans" and "services or activities performed in the administration or management of health care of workers' compensation plans." (Policy, ECF No. 18-1, Definitions, § IV(K).) (*See* Opposition, ECF No. 19 at 11-12, summarizing allegations in the Altair complaint relating to "Managed Care Activity," including design and implementation of financial incentive programs, development of clinical guidelines, practice parameters, and protocols, and services performed in the administration of health-care plans.)

Allied does not explain how the Policy's definition of "Managed Care Activity" can be read to exclude conduct that Altair alleged in its complaint. Instead, Allied relies on the Policy "as a whole," arguing that it "is a Managed Care Errors & Omissions policy, not a business liability or Directors & Officers policy." (Reply, ECF No. 23 at 6-7.) "The risk insured is an error or omission in the insured's business as a managed care plan, not its anti-competitive activity as a purveyor of fashion eyewear." (*Id.*) In short, Allied asserts, coverage is limited to liability for services provided by the managed care plan. (*Id.* at 9.) That, it says, is not the liability faced by the plaintiffs in *Altair* action: their liability was "neither premised on their conduct in establishing healthcare plan networks (e.g., a provider suing for being unfairly denied entrance into a health care plan network) nor for functions that involve the typical administrative and sales activities needed to maintain a managed care organization." (Motion, ECF No. 17 at 8.) Instead, "Altair sued for unfair competition under Business & Professions Code § 17200, not for mismanagement of its own health care plan." (Reply, ECF No. 23 at 5-6, emphasizing that Altair did not claim that it was harmed "as a user of managed care services.")

This argument does not change the outcome. It is true that "[t]he terms in an insurance policy must be read in context and in reference to the policy as a whole, with each clause helping to interpret the other," *Sony Computer Entm't Am. Inc. v. Am. Home Assurance Co.*, 532 F.3d 1007, 1012 (9th Cir. 2008) (citations omitted). But one cannot ignore the policy's definitions. "If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992). The Policy's definition of "Managed Care Activity" covers allegations in the

ORDER (No. 3:15-cv-03643-LB)

10

*Altair* complaint. Moreover, the Policy defines the risk that it is insuring, providing coverage for "any **Insured Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period**." (Policy, ECF No. 18-1, Insuring Agreement, § I.) A "Claim" is "any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act**"; a "Wrongful Act," includes "any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity**." (Policy, ECF No. 18-1, Definitions, § IV(C), (W)(1).) And again, the Policy does not restrict coverage to "Claims" brought by healthcare providers or plan members.

Third, Allied suggests that "principles" articulated by the California Supreme Court in *Bank of the West* bar coverage under the Policy for the "types of allegedly anticompetitive practices" at issue in the *Altair* Action. (Reply, ECF No. 23 at 3, 4.) In *Bank of the West*, the California Supreme Court interpreted the scope of coverage in a comprehensive general liability insurance policy. *See* 2 Cal. 4th at 1258. The court addressed whether the policy covered the "damages" the insured had to pay because of "advertising injury." *Id.* at 1262. The policy defined "advertising injury" as a list of tort offenses arising in the course of advertising activities, one of which was "unfair competition," which the policy did not define. *Id.* The court applied general principles of contract interpretation and concluded that the undefined term "unfair competition" referred to the common-law tort and not the much broader statutory definition. *Id.* at 1262-73. But as the plaintiffs point out in their sur-reply, the policy here is markedly different. Coverage is not limited to common-law torts, and the issue is not about construing an undefined term (such as "unfair competition") in the context of other terms that give it meaning. Instead, this is a policy covering acts, errors, and omissions in the performance of "Managed Care Activity," a defined term that covers a broad range of advertising, marketing, and administrative activities in providing health services or managing a health-care plan. (*See* Sur-Reply, ECF No. 32-1 at 7.)

In sum, under the plain language of the Policy, and interpreting the Policy broadly to afford the greatest possible protection to the insured, the *Altair* Action is a covered "Claim." *See MacKinnon*, 31 Cal. 4th at 648.

ORDER (No. 3:15-cv-03643-LB)

11

**CONCLUSION**

The court denies Allied's motion to dismiss. This disposes of ECF No. 17.

**IT IS SO ORDERED.**

Dated: November 12, 2015  _____
LAUREL BEELER
United States Magistrate Judge